MILBREW, INC. AND AMBER LABORATORIES, A WHOLLY OWNED SUBSIDIARY; MARTIN BERNSTEIN AND RUTH BERNSTEIN; ESAU ACE BERNSTEIN AND EVA BERNSTEIN; NORMAN N. BERNSTEIN AND FREIDA D. BERNSTEIN; MELVIN BERNSTEIN AND SHARON BERNSTEIN; SHELDON BERNSTEIN AND ESTELLE BERNSTEIN; LEONARD D. BERNSTEIN; JUDITH R. BERNSTEIN; JAMES E. BERNSTEIN; DAVID B. BERNSTEIN; JODI L. BERNSTEIN; RICHARD N. BERNSTEIN; BRADLEY A. BERNSTEIN; LYNN C. BERNSTEIN; MARCY B. BERNSTEIN; MARY BERNSTEIN DIAMOND; HOWARD I. BERNSTEIN AND BARBARA BERNSTEIN; HOWARD I. BERNSTEIN; DAVID J. CUNNINGHAM AND MARY J. CUNNINGHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Milbrew, Inc. v. Commissioner
Docket No. 4349-76.
United States Tax Court
T.C. Memo 1981-610; 1981 Tax Ct. Memo LEXIS 144; 42 T.C.M. (CCH) 1467; T.C.M. (RIA) 81610; October 19, 1981. *144 1. Martin and Ace Bernstein purchased a manufacturing plant in Juneau, Wisconsin, for $ 524,236. Approximately 20 months later the plant purportedly was sold to NVST, a partnership consisting of all of the Bernstein petitioners for $ 3,000,00. No cash was paid at the time of the "sale" and less than $ 140,000 (designated as interest) was paid by NVST with respect to the "purchase" over the ensuing 4 years. Held, no bona fide sale occurred and the depreciation deductions claimed by NVST, based upon its purported "cost" of $ 3,000,000, are disallowed. 2. Held, deductions for "interest" payments by NVST with respect to its "indebtedness" in connection with the purported purchase of the Juneau plant disallowed. 3. Held, amounts deducted by Milbrew, Inc., for rental payments for use of the Juneau plant and equipment were unreasonable; respondent's determination sustained as to the rent deduction allowable to Milbrew. 4. Held, NVST is not entitled to the investment credit on certain equipment which it acquired for lease because the sec. 162, I.R.C. 1954, operating expenses with respect to the equipment did not exceed 15 percent of the rental income received with respect to the *145 equipment. 5. Held, petitioners have failed to prove that a $ 9,000 "commitment fee" paid to obtain a mortgage loan was a deductible interest expense rather than a payment for service which must be amortized over the life of the loan. 6. Ace and Martin Bernstein each held 25-percent interests in an apartment building which was sold in 1973 at a net gain. At settlement, the sellers received a check which was eventually endorsed over to another party for the acquisition of an interest in another apartment project. Held, this transaction does not qualify as a tax-free exchange of like-kind property under sec. 1031, I.R.C. 1954, because the sellers received cash for their property. 7. NVST owned certain equipment which it held for rental income. NVST purportedly "sold" the equipment to EMMNS, a joint venture consisting of the five general partners of NVST (who jointly held 33.5 percent of NVST). The "selling price," which equaled NVST's book value of the equipment, was paid solely with unsecured notes of EMMNS. Thereafter EMMNS began claiming depreciation deductions at a rate greater than that previously used by NVST. Held, the purported "sale" by NVST to EMMNS was a sham, created *146 solely to increase depreciation deductions to the five general partners of NVST. Depreciation deductions claimed by EMMNS disallowed. 8. Held, petitioners have filed to prove that NVST had a greater depreciable basis in certain properties than that determined by respondent. 9. Petitioners computed depreciation on certain investment real estate propertie, using the component method. Held, petitioners have proved the allocable costs and useful lives of the several components for some of those properties; respondent's adjustments to costs and useful lives of components of buildings depreciated by petitioners on the component method sustained for the remaining properties. 10. Held, respondent's increase in income of partners of NVST for their respective portions of a deduction claimed by NVST for "accrued interest" on partners' capital accounts sustained. Garr W. Steiner, John C. Lapinski, E. Ace Bernstein, and Howard I. Bernstein, for the petitioners. Robert E. Dallman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: [1] *147 The following deficiencies are at issue: Per
Increase Per
Statutory
Amendments
Name
Years
Notice
To Answer
Esau Ace and Eva Bernstein
1972
$ 28,908.73
$ 6,203.11
1973
38,174.27
9,016.30
Martin and Ruth Bernstein
1972
42,274.92
8,110.41
1973
56,464.95
13,493.46
Melvin and Sharon Bernstein
1972
22,758.89
2,658.90
1973
33,411.97
5,891.79
Norman N. and Freida D. Bernstein
1972
22,773.78
2,661.37
1973
33,358.49
5,869.11
Sheldon and Estelle Bernstein
1972
22,779.12
2,637.54
1973
32,360.68
5,813.03
David J. and Mary J. Cunningham
1972
9,895.96
1973
11,388.64
Mary Bernstein Diamond
1972
1,287.72
195.00
1973
2,528.18
611.48
James E. Bernstein
1972
1,726.23
186.94
1973
2,322.59
435.60
David B. Bernstein
1972
1,895.02
186.92
1973
2,660.71
460.91
Jodi L. Bernstein
1972
1,731.02
186.93
1973
2,463.43
430.60
Howard I. Bernstein
1972
$ 1,363.50
$ 192.06
Howard I. and Barbara Bernstein
1973
1,853.59
358.67
Leonard D. Bernstein
1972
1,912.67
186.93
1973
2,872.16
439.65
Judith R. Bernstein
1972
1,710.29
186.92
1973
2,466.40
435.58
Marcy B. Bernstein
1972
2,952.46
337.75
1973
4,239.04
797.55
Lynn C. Bernstein
1972
2,888.21
330.63
1973
4,007.84
784.78
Bradley A. Bernstein
1972
1,923.40
193.74
1973
2,477.32
435.59
Richard N. Bernstein
1972
1,852.37
186.93
1973
2,913.59
440.17
Milbrew, Inc. and Amber
1972
140,115.70
Laboratories, Inc.
1973
189,781.19
Totals
1972
$ 310,749.99
$ 24,642.08
1973
$ 425,745.04
$ 45,714.27
$ 736,495.03
$ 70,356.35
*148 Petitioners also claimed various overpayments in their amended petition but have not stated the amount of tax involved in those overpayments. Due to concessions by the parties, the issues remaining for decision are: 1. Whether the transfer of real and personal property located at 330 Mill Street, Juneau, Wisconsin (the Juneau plant) to NVST Co. (NVST) was a bona fide sale for tax purposes; and, if so, was the sale price set at the property's fair market value; 2. Whether payments made by NVST in connection with the Juneau plant transfer qualify as deductible interest payments; 3. Whether Milbrew properly claimed deductions for rent payments made to NVST for use of the Juneau plant; 4. Whether NVST is entitled to investment credits for 1972 and 1973 for the purchase of certain equipment; 5. Whether a commitment fee paid to obtain a mortgage is a deductible interest expense; 6. Whether the sale and purchase of interest in apartment projects by Act and Martin Bernstein qualify for tax free treatment under section 1031; [2] 7. Whether the purported *149 sale of equipment by NVST to EMMNS was a bona fide transaction for tax purposes; 8. Whether respondent correctly determined NVST's depreciable basis in certain properties; 9. Whether respondent correctly determined the useful life of certain real property; 10. Whether the partners of NVST are entitled to a deduction claimed by NVST as "accrued interest." FINDINGS OF FACT Petitioner, Milbrew, Inc. (Milbrew), is a Wisconsin corporation with its principal place of business in Wisconsin. It filed its Federal income tax returns for 1972 and 1973 with the Internal Revenue Service Center, Milwaukee, Wisconsin. Amber Laboratories, Inc. (Amber), wholly owned by Milbrew, is also a Wisconsin corporation. For the years 1972 and 1973, Amber was included, as a consolidated subsidiary, in the Federal income tax returns filed by Milbrew. Petitioners Martin Bernstein (hereinafter Martin) and his wife, Ruth; Esau Ace Bernstein (hereinafter Ace) and his wife, Eva; Melvin Bernstein and his wife, Sharon; norman Bernstein and his wife, Freida; Sheldon Bernstein and his wife, Estelle; David Cunningham and his wife, Mary; are residents of Wisconsin. Each couple timely filed joint Federal income tax *150 returns for 1972 and 1973 with the Internal Revenue Service Center, Milwaukee, Wisconsin. Petitioner Howard Bernstein, a resident of Wisconsin, filed his 1972 individual income tax return with the Internal Revenue Service Center, Milwaukee, Wisconsin. For 1973 he filed a joint return with his then wife, Barbara, also a Wisconsin resident, with the Milwaukee Service Center. Petitioner Mary Bernstein Diamond resided in Ohio when she filed her petition. She filed Federal income tax returns for 1972 and 1973 with the Internal Revenue Service Center, Cincinnati, Ohio. Petitioners James E. Bernstein, David B. Bernstein, Jodi L. Bernstein, Leonard D. Bernstein, Judith R. Bernstein, Marcy B. Bernstein, Lynn C. Bernstein, Bradley A. Bernstein, and Richard N. Bernstein are residents of Wisconsin, and they filed Federal income tax returns for 1972 and 1973 with the Internal Revenue Service Center, Milwaukee, Wisconsin. NVST is a limited partnership, organized under Wisconsin law, consisting of the following partners (listed by family group): [3] *151 Initial
Name
Relationship
Capital
Ace Bernstein
Husband/father
$ 2,500.00
Eva Bernstein
Wife/mother
2,500.00
Marcy Bernstein
Child
1,250.00
Lynn Bernstein
Child
1,250.00
Martin Bernstein
Husband/father
2,500.00
Ruth Bernstein
Wife/mother
2,500.00
Sue Ann Weller
Child
1,250.00
Janet Lee Frenz
Child
1,250.00
Norman Bernstein
Husband/father
2,500.00
Frieda Bernstein
Wife/mother
2,500.00
Howard Bernstein
Child
833.33
Leonard Bernstein
Child
833.33
Judith Bernstein
Child
833.33
Melvin Bernstein
Husband/father
2,500.00
Sharon Bernstein
Wife/mother
2,500.00
Mary B. Diamond
Child
833.33
David Bernstein
Child
833.33
James Bernstein
Child
833.33
Steldon Bernstein
Husband/father
2,500.00
Estelle Bernstein
Wife/mother
2,500.00
Bradley Bernstein
Child
833.33
Richard Bernstein
Child
833.33
Jodi Bernstein
Child
833.33
Limited/
Age
General
Percentage
(as of 1/1/69)
Partner
Ace Bernstein
6.67
54
General
Eva Bernstein
6.67
49
Limited
Narcy Bernstein
3.33
14
Limited
Lynn Bernstein
3.33
11
Limited
Martin Bernstein
6.67
49
General
Ruth Bernstein
6.67
48
Limited
Sue Ann Weller
3.33
21
Limited
Janet Lee Frenz
3.33
19
Limited
Norman Bernstein
6.67
46
General
Frieda Bernstein
6.67
? Limited
Howard Bernstein
2.22
17
Limited
Leonard Bernstein
2.22
14
Limited
Judith Bernstein
2.22
11
Limited
Melvin Bernstein
6.67
42
General
Sharon Bernstein
6.67
40
Limited
Mary B. Diamond
2.22
17
Limited
David Bernstein
2.22
14
Limited
James Bernstein
2.22
12
Limited
Sheldon Bernstein
6.67
41
General
Estelle Bernstein
6.67
40
Limited
Bradley Bernstein
6.67
17
Limited
Richard Bernstein
6.67
14
Limited
Jodi Bernstein
2.22
11
Limited
*152 NVST timely filed information returns (Form 1065) for 1972 and 1973 with the District Director of Internal Revenue, Milwaukee, Wisconsin. 1. Depreciation of the Juneau Plant
Milbrew was organized in 1936 to manufacture an animal feed additive from brewery yeast slurry and cheese manufacturing residue. The company is still involved in this business. Beginning in 1939, Milbrew operated a plant on Buffum Street in Milwaukee. Over the years, operations in the Milwaukee plant became increasingly difficult due to labor problems, obsolete equipment, infestation, and other factors. Additionally, a lack of capital, a dwindling market for ts product, and a lack of business acumen on the part of Sheldon, Norman, and Melvin, who operated Milbrew for several years prior to 1967, contributed to Milbrew's declining financial condition. In 1965 or 1966, Milbrew began "tolldrying" its product at other processing plants in several States. ("Tolldrying" refers to an arrangement whereby material is dried at plants owned by others at an agreed price per pound.) By late 1966, most of Milbrew's product was being tolldried at a plant located in Juneau, Wisconsin, which was owned by the Pure Milk Association *153 (PMA). In an attempt to stem Milbrew's increasing financial woes, Sheldon, Norman, and Melvin issued a 25-percent share of Milbrew's voting stock to Ace in return for his efforts to rescue the company. Ace became the dominant figure controlling the financial affairs of Milbrew. The stockholders and officers of Milbrew, subsequent to May 1967 and through the years in issue, were as follows: Shares Held
Stockholder
Nonvoting
Voting
Office Held
Sheldon Bernstein
39
1
President
Selma Bernstein
19
0
Melvin Bernstein
9
1
Vice President
Norman Bernstein
9
1
Secretary-Treasurer
Ace Bernstein
0
1
Milberew issued the one share to Ace in 1966 without obtaining any payment from him. In 1967, the board of directors consisted of these stockholders except Selma Bernstein. In May 1967, Ace and Martin purchased the Juneau plant through their agent, their wholly-owned corporation, Northland Developers, Inc. (Northland) for $ 524,236. At that time it was contemplated that Milbrew would rent the plant from Northland. For the last 8 months of 1967 and for the entire year 1968, Milbrew paid rent of $ 87,000 and $ 100,000, respectively. On October 31, 1967, Northland placed a first mortgage on the property in the amount *154 of $ 375,000 with the Bank of Commerce as mortgagee. As of December 1972, the property was still subject to this mortgage with a balance due of $ 344,186.38. At the time of the purchase of the Juneau plant by Ace and Martin in 1967 and continuing through 1972, there were many processing plants for sale throughout the State of Wisconsin. Although the plants varied greatly in their processing capacity and conditions of building and equipment, they were all selling in the $ 400,000 to 600,000 range.The selling prices were generally based on the net book values of the plants. The plants were for sale mainly due to significant changes in the daily industry. On January 1, 1969, NVST, a limited partnership, was formed under Wisconsin law. NVST was founded with a stated initial aggregate "capitalization" of $ 37,500, allocated among the several partners in accordance with their percentages of partnership interest. No cash or other assets, however, were actually paid into the partnership, and no note was given to cover the purported capital contribution. Rather, the $ 37,500 remained as a "receivable" on the books of NVST through 1973. A certificate of limited partnership was filed *155 for NVST in July 1969. On January 1, 1969, Northland, as agent for Ace and Martin, entered into a "land contract" with NVST to sell [4] *156 the Juneau plant to NVST for $ 3,000,000. The contract provided that during the first 5 years, NVST would pay interest at the rate of 4 percent per annum, and no principal. During the next 5 years, NVST was obligated to pay $ 50,000 per year. This payment would be applied first to the interest at 4 percent, with the balance applied to principal. [5] During the eleventh through the twentieth years, NVST would pay $ 300,000 per year applied first to the 4-percent interest and the balance to principal. Any remaining principal balance was due at the end of 20 years. The contract further provided that upon payment of the full contract price and interest, Northland would deliver the deed to NVST. The land contract was not recorded in the local land transfer records. After the execution of the land contract on January 1, 1969, the plant's occupant, Milbrew, began paying rent to NVST.The parties did not execute a lease but instead determined rent on a year-to-year basis. The rent was based upon Milbrew's ability to pay and represented virtually all of its income. Moreover, the rent paid by Milbrew constitutied almost all of NVST's income. The following table sets forth the amounts paid and deducted by Milbrew as rent to NVST during the period 1969 through 1973, and the manner in which such amounts were "paid," as reflected on the books of Milbrew. Also reflected are the net taxable income and gross sales as reported on Milbrew's Federal income tax returns for those years: Rent
1969
1970
1971
Cash payment to
NVST
$ 18,182.88
$ 4,673.40
Capital improvements
to plant
paid for by
Milbrew
222,050.00
59,926.60
Bookkeeping
entries [1]
$ 220,000.00
195,350.00
Other third-party
payments
on behalf of
NVST
Cash advances
to Northland
Development
Co. (ND Co.) [2]
Total rent to
NVST
$ 220,000.00
$ 240,232.88
[3] $ 259,950.00
Net taxable
income
$ 1,539.83
$ 2,358.08
$ 8,074.13
Gross sales
$ 1,530,277.44
$ 1,485,976.69
$ 2,271,879.90
*157 Rent
1972
1973
Cash payment to
NVST
$ 133,231.22
$ 90,012.61
Capital improvements
to plant
paid for by
Milbrew
76,448.85
265,637.39
Bookkeeping
entries [1]
118,000.00
other third-party
payments
on behalf of
NVST
1,282.93
Cash advances
to Northland
Development
Co. (ND Co.) [2]
82,000.00
177,000.00
Total rent to
NVST
[3] $ 410,963.00
$ 532,650.00
Net taxable
income
$ 8,282.40
$ 8,066.04
Gross sales
$ 2,471,782.97
$ 2,872,671.52 The following table summarizes relevant details of *158 the Federal income tax information returns of NVST for the years 1969 through 1973: 1969
1970
1971
Rent income: Juneau plant
$ 220,000.00 $ 240,232.88 [1] $ 256,950.00 Other properties [2]
15,895.11 25,027.28 Interest and misc. other income
1.32 Depreciation claimed: Juneau plant (based upon $ 3 million
"purchase" from Northland)
(219,055.60)
(219,055.60)
(219,055.60)
Juneau plant (improvements subsequent
to "purchase" from Northland)
(14,995.91)
Other properties
(20,121.64)
(41,173.56)
Interest expense: "Bernstein & Bernstein" [3]
(16,950.75)
(27,500.00)
"Accrued"
Payments to partners--salaries and
interest
expenses
Professional fees, repairs and misc.
other
expenses
(944.40)
(8.89)
Net income
$ (20,755.36)
1972
1973
Rent income: Juneau plant
[1] $ 427,306.96 $ 541,650.00 Other properties [2]
7,658.91 22,025.75 Interest and misc. other income
1,852.89 27,634.16 Depreciation claimed: Juneau plant (based upon $ 3 million
"purchase" from Northland)
(263,816.80)
(307,360.40)
Juneau plant (improvements subsequent
to "purchase" from Northland)
(9,737.49)
(24,263.44)
Other properties
(41,726.31)
(52,195.62)
Interest expense: "Bernstein & Bernstein" [3]
(35,049.92)
(57,599.92)
"Accrued"
(15,764.02)
Payments to partners--salaries
and interest
expenses
(14,999.76)
Professional fees, repairs and misc. other
expenses
(784.21)
(22,491.87)
Net income
$ 70,704.27 $ 111,634.64 *159 The following table reflects the amounts due and amounts paid by NVST as interest under the terms of the land contract for the years 1969 through 1973: Year
Amounts Due
Amount Paid
Unpaid Balance
1969
$ 120,000.00
$ 120,000.00
1970
120,000.00
$ 16,950.75
103,049.25
1971
120,000.00
27,500.00
92,500.00
1972
120,000.00
35,049.92
84,950.08
1973
120,000.00
57,599.92
62,400.08
$ 600,000.00
$ 137,100.59
$ 462,899.41
The partnership agreement of NVST provides that profits and losses of the partnership are to be allocated among the parties in proportion to their respective capital contributions. The 1971 loss of $ 20,755.36, however, was allocated for tax purposes only to *160 the five general partners, in the amount of one-fifth each. The 1972 net income was allocated in proportion to the percentages of partnership interest, except that the amounts allocabel to Sue Ann Weller and Janet Lee Frenz were allocated to their parents, Martin and Ruth Bernstein. Finally, the 1973 net partnership income of $ 111,634.64 was allocated among the partners so that in no instance was the allocated amount in proportion to the partner's percentage of partnership interest. On the 1972 and 1973 returns of NVST, the spaces in the forms where the partners' percentages of profit-sharing are to be shown were left blank. In February 1969 a building repair firm seeking payment for repairs performed at the Juneau plant in 1968, filed a lawsuit against Northland in a Wisconsin court. In the answer to the complaint, prepared by Ace as attorney for Northland, and sworn to by Martin as corporate secretary of Northland, Northland specifically admitted that it owned the property at the time of the suit. In October 1972, Northland executed a mortgage on the Juneau plant in the amount of $ 600,000 in favor of the Bank of Commerce. In the mortgage, executed by Ace and Martin for Northland, *161 it is stated that "NORTHLAND DEVELOPERS, INC., mortgagor, covenants that it has good right to sell and convey said premises and that they are free from encumbrances, and hereby warrants the title thereto against all persons whomsoever." This mortgage was personally guaranteed by Ace and Cunningham and their respective wives. In November 1972, Milbrew filed with the U.S. Treasury Department a form for registration of the Juneau plant as a "distilled spirits plant." In this form, Northland was designated as the title holder of the property. Milbrew included with the registration application a "Consent" form, executed by Northland, consenting to the use of the property by Milbrew for distilling spirits and agreeing that the lien of the United States for any unpaid taxes on distilled spirits produced there would take precedence over Northland's interest in the property. This consent form indicated that the property was "encumbered," and listed a first mortgage of the Bank of Commerce as the only "encumbrance." [6] Also appended to Milbrew's application was a similar consent form, signed by the Bank of Commerce as mortgagee, in which the bank consented to the subordination of its interest *162 to any future Federal lien for unpaid distilled spirits taxes. Both of these forms stated that Northland was te owner of the property in fee simple. In addition, Milbrew's application form, which declares itself to be "true, correct and complete," was signed "under the penalties of perjury" by Norman Bernstein as secretary of Milbrew. Northland's consent form was signed by Ace as president. Although Ace and Norman also were general partners of NVST, neither form reflects any interest of NVST in the plant property. At a hearing of the Board of Review for the City of Juneau in July 1973, Ace testified under oath on behalf of Northland concerning the real estate tax assessment on the Juneau plant. At that hearing, a letter dated July 6, 1973, from Ace, representing Northland, to the Wisconsin Department of Revenue, was introduced into the record. In the letter, Ace stated that a reasonable assessment for the plant was $ 500,000. In another letter, dated October 10, 1974, from Northland by Ace as president *163 to the Wisconsin Department of Revenue, Ace stated with respect to the Juneau plant: 1. This is an old property constructed from early 1916 to 1950 approximately and was purchased principally for its equipment. It was purchased May 1, 1967 from Pure Milk Association with offices in Chicago, Illinois. Since then this association has become a part of Associated Milk Producers, Inc. The Bill of sale shows the following values: Land
$ 13,159.75
Buildings
165,247.62
Office Furniture & Equipment
3,060.86
Machinery & Equipment
318,961.91
Total
$ 500,430.14
Included herein is a Residential 5 room house formerly used by plant manager 238 Hyland Avenue, Juneau, Wisconsin. 2. No additions to the buildings have been made since its purchase, some repairs. Some items, principally roofs, sewers and electrical wiring have deteriorated badly, and are substantially less valuable. 3. The value assessed should be "fair market value." We recently (3/1/74) purchased a similar plant with similar equipment at Antigo, Wisconsin from Associated Milk Producers, Inc. It was valued as follows: Land
$ 10,934.10
Land Improvement
2,645.77
Buildings
150,000.00
Machinery & Equip.
238,460.21
Office Furniture
1,270.45
Total
$ 403,310.53
This *164 plant is comparable with the Juneau plant in every way. We feel that the value shown in paragraph 1 is still valid today, because while there has been some appreciation, the physical deterioration since 1967 has more than offset it. 4. The value shown in paragraph 1 includes the residential building located in Juneau and valued at not more than $ 10,000; therefore, the fair market value should be: Land
$ 13,159.75
Buildings
155,247.62
Office Furniture & Equipment
3,060.86
Machinery & Equip.
318,961.91
Total
$ 490,430.14
The buildings are insured with Continental Casualty at $ 100,000 a copy of which is attached hereto. In December 1974, Northland wrote to the Property Assessment Office in Madison, Wisconsin, appealing a tax assessment of the Juneau plant. The letter is written as an appeal by Northland as the beneficial owner of the property, and it refers to the use of the property by "our lessee," as follows: We feel that the assessor has valued the buildings too highly and underrated the machinery. As far as we are concerned, the building is located far from the markets and far from the raw material sources of our lessee, and its design and architecture is old and not modern in concept. *165 The only value the building has is that it protects the machinery. The machinery is of the type usable by our lessee and that was why we bought the property. Another letter, with similar references and implications, was written in October 1975. At a 1974 hearing on the real estate tax appeal, Ace, testifying under oath, stated that Northland had bought the plant in 1967 at a price equal to the book value on the seller's books, and that-- In the interim years the only improvements to this real estate have been the units that have entirely deteriorated. The sewer was out this week. We replaced the sewer. It was so defective so that it was not operating. There have been no structural repairs that I am aware of. Ace also made the following representation to the State taxing authorities: I have to feel that from 1967 to 1974 -- the time of the purchase of the Juneau plant to today -- economic conditions, no matter what I say, could have accelerated and there has been inflation, so that there has got to be some increase in value to it. But I also maintain that when you take old buildings of this kind, the cost of maintenance of them and their depreciation is also unaccelerated *166 depreciation, so that I feel the fair market value is the book value as was paid for, and the purchase price as was paid for in 1967. In connection with the real estate tax assessment on the Juneau plant, Patrick Schulte (Schulte), a property appraiser for the Wisconsin Department of Revenue, found that the Juneau plant was not reflected in the income tax returns of Northland.He subsequently learned of the existence of NVST and that the plant was reflected on NVST's returns, at an original cost of $ 3,000,000. Schulte questioned Ace about the situation, and Ace replied that Northland was the owner of the plant. When asked by Schulte why Northland did not include the plant in its income tax returns, Ace was evasive. Schulte, in his appraisal of value for real estate tax purposes, ignored the land contract and the $ 3,000,000 price used therein. Wisconsin "Combined Manufacturing Real Estate and Personal Property Return" forms were filed for 1974 and 1975 in the name of Northland. [7] *167 These returns included the Juneau plant, and reflected its cost at $ 500,430.14. 2. Interest Payments on NVST's Land Contract
Pursuant to the land contract in which NVST "acquired" the Juneau plant, NVST purportedly paid and deducted interest of $ 35,049.92 in 1972 and $ 57,599.92 in 1973. These deductions were disallowed by respondent. 3. Milbrew's Rent Deduction for the Juneau Plant
Milbrew is an accrual basis taxpayer, and NVST is a cash basis taxpayer. In 1972, Milbrew deducted $ 410,963 as rent to NVST for the Juneau plant. In 1973, it deducted $ 532,650. These amounts consisted of the following forms of payment: 1972
1973
Cash payment to NVST
$ 133,231.22
$ 90,012.61
Capital improvements to plant
paid for by Milbrew
76,448.85
265,637.39
"Notes payable"
118,000.00
Other third party payments on
behalf of NVST
1,282.93
Cash advances from Milbrew to
ND Co.
82,000.00
177,000.00
$ 410,963.00
$ 532,650.00 Milbrew also deducted, as rent for equipment purportedly "owned" by EMMNS, $ 9,999.96 and $ 21,900.04 in 1972 and 1973, respectively. The $ 118,000 in "notes payable" in 1972 represented entries credited by Milbrew on its books although no notes were issued and no payments were made to reduce this liability. Milbrew treated *168 the cash advances it made to ND Co. as part of its rent to NVST. The $ 177,000 advance, treated as rent in 1973, originally was advanced to ND Co. in 1972 as a loan from Milbrew. In 1973, the loan receivable was "transferred" by Milbrew to NVST and applied as a rent payment.This amount was recorded in 1973 by NVST as a receivable. The $ 82,000 advanced to ND Co. and applied as a rent payment in 1972 was not recorded as a receivable by NVST. Respondent disallowed all of the claimed rent deductions with respect to the equipment and all but $ 120,000 in 1972 and $ 150,000 in 1973 with respect to the Juneau plant. 4. Investment Credit
In 1972, NVST purchased equipment for Milbrew's use in the Juneau plant at a cost of $ 41,027.51. This equipment had a useful life of 33 years. In the same year, NVST paid expenses relating to the Juneau plant of $ 15,004.13 which qualified as a business expense deduction under section 162. NVST also paid $ 9,121 in 1972 in connection with the Juneau plant which was capitalized in NVST's 1972 return.
In 1973, NVST purchased additional equipment for use by Milbrew in the Juneau plant at a cost of $ 257,378.76.NVST paid $ 10,971.94 in expenses relating *169 to the Juneau plant which were deductible as business expenses. Further NVST paid $ 5,227.04 in connection with the Juneau plant which was capitalized in NVST's 1973 return. Also during 1973 NVST paid $ 11,249.82 to certain individuals. These amounts were neither deducted by NVST nor reported as income by the recipients. NVST claimed an investment credit on the equipment of $ 41,027.51 in 1972 and $ 257,378.76 in 1973. Respondent disallowed the entire amounts of claimed credits. 5. Commitment Fee
During 1972, some of the petitioners [8] formed a joint venture for the construction of a 133-unit apartment building in Milwaukee. The project was to be financed in part by a mortgage loan from Badger Federal Savings and Loan Association (Badger). On May 5, 1972, Badger issued a commitment letter for a $ 1,800,000 loan at 7.75 percent interest. The commitment letter, which was accepted in writing by the borrowers, required the borrowers to pay a "Commitment Fee" of $ 9,000 and an "Initial Service Charge" of 2 percent of the loan amount ($ 36,000). The $ 9,000 fee was paid to Badger on May 5, 1972. The $ 36,000 was paid from the proceeds of the loan at the time that the loan was *170 closed on June 28, 1972. Petitioners claimed these payments as interest deductions in 1972. Respondent disallowed the deductions, determining that the payments should be amortized over the life of the loan. The parties now agree that the $ 36,000 "Initial Service Charge" should be amortized and deducted ratably over the life of the loan. 6. Like-Kind Exchange
In 1956, Ace, Martin, and Hyman Brown (Brown) purchased an apartment building at 27th and Center Street (Center Street property). Ace and Martin each held a 25-percent interest while Brown held the remaining 50 percent. Brown died in 1968. In 1973, Ace and Martin and the trustees of the Hyman A. Brown Family Trust transferred the property to Ferdinand and Lillian Schmutzler, at a price resulting in a net gain of $ 9,345.29. At settlement, the sellers received a check which they eventually endorsed over to the Emporium Company for the acquisition of interests *171 in property located on N. Maryland in Milwaukee (the N. Maryland property). The N. Maryland property was being improved with an apartment building. The interests in the N. Maryland property were acquired in the names of Ruth Bernstein (wife of Martin) and Eva Bernstein (wife of Ace). No portion of the $ 9,345.29 gain was reported by Ace or Martin in their 1973 returns. Respondent determined that the gain constituted taxable capital gains income to Ace and Martin. 7. Equipment Depreciation by EMMNS
On or about January 1, 1972, the five general partners of NVST formed a joint venture named EMMNS. EMMNS had no bank account, books, or letterhead stationery. On January 1, 1972, EMMNS purchased from NVST certain equipment which NVST had been leasing to Milbrew. Subsequently, in 1973, additional equipment also under lease to Milbrew was purchased by EMMNS from NVST. EMMNS continued to lease the purchased equipment to Milbrew after the sale. The price of the equipment sold by NVST equaled the book value or adjusted basis of the equipment at the time of sale. The consideration for the 1972 purchase consisted of a 10-year promissory note, in the amount of $ 201,416.33. The note bore *172 no interest for the first 5 years and interest at 6 percent thereafter. The 1973 purchase price was paid with a 10-year promissory note, bearing no interest, in the amount of $ 238,000. Neither the sales agreements nor the promissory notes provided any collateral or other security for the payment of the notes. After the equipment sales, Milbrew continued to pay the rent due on the equipment to NVST. NVST credited these payments as reductions of the principal on its notes from EMMNS. No other payments were made by EMMNS with respect to its promissory notes to NVST. On January 1, 1974, EMMNS sold the equipment which it had purchased in 1972 and 1973 back to NVST for the unpaid balance of the promissory notes ($ 347,823.30). While EMMNS owned the equipment, it depreciated the equipment at a rate greater than that used by NVST. The partners of EMMNS claimed $ 52,892.05 and $ 32,700 in depreciation deductions on the property received in 1972 and 1973, respectively. Respondent disallowed the claimed deductions and attributed the rent income reported by EMMNS to NVST. 8. $ 225,000 Issue
On May 31, 1970, NVST purchased an interest in certain properties as follows: 6101 N. Teutonia Avenue
12 percent
1230 East Auer Avenue
12 percent
2020 East Park Place
12 percent
2616 North Frederick
12 percent
2332 North Oakland
12 percent
2333 North Oakland
12 percent
2727 North Maryland
25 percent
2645 North Farwell
18.66 percent
17301 Muskego-Coast to Coast Store
12 percent
17273 Muskego-A & P Store
25 percent
3023 Greenfield- A & P Store
12 percent
2213 National Food Store
12 percent
Muskego - Shaffer Farm
[1] *173 12.5 percent
Prior to the sale, Ace and Martin each owned a 25-percent interest and Cunningham owned a 50-percent interest in the properties. After the sale, Ace and Martin each owned 22 percent and Cunningham owned 44 percent of the properties. [9]
Petitioners claimed a depreciable basis of $ 718,647 ($ 768,647 total sales price less $ 50,000 attributable to the land.) Petitioners depreciated the properties at a rate of 4.8 percent. Respondent determined that the total sales price was $ 543,647, which was the amount of liabilities encumbering the properties that NVST assumed. Consequently, respondent allowed depreciation deductions on a depreciable basis of $ 493,647 ($ 543,647 sales price less $ 50,000 attributable to land). Respondent also determined that the proper rate of depreciation was 3 percent. 9. Depreciation of Other Buildings
A.N. Farwell
In 1972, a joint venture comprised *174 of NVST, Ace, Martin, Cunningham, and another individual acquired an apartment complex located at 2645 N. Farwell as an estate in common under Wisconsin law. The complex, constructed in 1967, was acquired in a foreclosure sale for $ 632,865. The venture used the straight-line component method of depreciation to claim depreciation deductions on the property of $ 18,140 in 1972 (partial year) and $ 30,390 in 1973. The venture based its computations upon an allocation of the total cost of the property among the various components as determined by Cunningham. Respondent recomputed depreciation on the building using a 35-year life under the straight-line composite method. [10]
B. Maryland Avenue
On May 1, 1973, a venture consisting of Martin and Ruth Bernstein, Ace and Eva Bernstein, Cunningham, and NVST completed the construction of an apartment building at 2727 N. Maryland Avenue at a cost of $ 1,704,469. *175 The venture claimed depreciation in 1973, using the straight-line component method, in the amount of $ 48,855. Respondent recomputed depreciation by increasing the useful lives of several of the components. In an amended petition, petitioners have claimed depreciation on the Maryland Avenue building in an amount greater than in their original returns. C. Other Properties
In 1972 and 1973, Cunningham, Martin, Ace, and NVST claimed depreciation deductions for properties, referred to as Teutonia Avenue, W. Janesville, Greenfield, North Avenue, Auer, N. Oakland, and N. Frederick, which they jointly owned. The N. Oakland and N. Frederick properties had been depreciated under the straight-line component method from the date of their construction in 1968. The other properties had been depreciated on the double-declining balance composite method until 1972, when a change was made to the straight-line component method. The method change was made without requesting or obtaining the consent of the Commissioner. On June 24, 1966, Ace, Martin, and Cunningham, settling a prior audit, executed a collateral agreement with respondent agreeing that the Teutonia property would be depreciated *176 on the double-declining balance method at a useful life of 40 years. Respondent has redetermined the depreciation deductions allowable with respect to each of these properties for 1972 and 1973. 10. Accrued Interest
In 1973, NVST made an entry for "interest" on the capital accounts of its partners, debiting "interest expense" and crediting an "accrued interest" account in the amount of $ 15,764.02. This amount was deducted by NVST for tax purposes but was not included as interest income in the 1973 returns of the respective partners. There was no actual payment of interest, directly or indirectly, by NVST to its partners. In January 1974, the "accrued interest" entry of $ 15,764.02 was debited and the capital account of each partner was credited for his allocable portion of this sum. OPINION 1.Depreciation of the Juneau Plant
NVST claimed depreciation deductions on the Juneau plant of $ 263,816.80 and $ 307,360.40 in 1972 and 1973, respectively. NVST based its deductions on its purported purchase of the plant in 1969 for $ 3,000,000. Respondent disallowed these depreciation deductions claimed by NVST and adjusted the respective partners' distributive shares of partnership income *177 for those years accordingly. Respondent contends, among other things, that the purported sale was a sham and, in substance, that the burdens and benefits of ownership did not shift to NVST. We agree with petitioners that they are entitled to plan and conduct their business transactions in such a way as to reduce their taxes or, indeed, to avoid them altogether.Nonetheless, "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469 (1935). Moreover-- In the field of taxation, * * * the courts are concerned with substance and realities, and formal written documents are not rigidly binding. Helvering v. Lazarus & Co., 308 U.S. 252, 254, 255 (1939). In the instant case, the close family and business relationships between the parties to the purported sale requires close scrutiny of the transaction to ensure that it has substance and reality. Petitioners have the burden of proving that NVST in reality acquired the plant and that the promise to pay $ 3,000,000 contained in the land contract actually reflected the "cost" of the acquisition within the meaning of section 1012. See *178 Decon Corp. v. Commissioner, 65 T.C. 829, 837-838 (1976); Bixby v. Commissioner, 58 T.C. 757, 782 (1972); cf. Higgins v. Smith, 308 U.S. 473, 476-477 (1940). We do not think they have carried that burden. After carefully considering all of the evidence, and relying heavily upon the objective facts to ascertain the realities, see King Enterprises, Inc. v. United States, 189 Ct. Cl. 466, 479-480, 418 F.2d 511, 519 (1969), we conclude that Northland did not make a bona fide sale of the Juneau plant to NVST and that, therefore, NVST did not have a basis for the plant to be computed with reference to the $ 3,000,000 purported cost. [11] As we view the evidence, Ace and Martin, through Northland, purchased the Juneau plant in May 1967 for $ 524,236 in an arm's-length transaction. [12] They then, within 20 months, attempted to create the appearance of a resale of the plant to a newly formed family partnership for $ 3,000,000. The plan was to transfer the income of Milbrew to NVST, both owned by the Bernstein families, in the form of "rent" and then to offset that income against artificially created depreciation deductions. Thus, we believe that the record shows that the purported sale lacked *179 business or economic reality and exposes the transaction as merely a step in a cleverly devised but poorly implemented tax avoidance scheme engineered by Ace who dominated the entities involved in the scheme. A. The Manipulation of NVST and Milbrew
The facts show that NVST, on January 1, 1969, served as a paper vehicle facilitating the tax avoidance scheme. The initial stated capital of NVST was a mere $ 37,500, and, at least through the tax years in issue, this sum had not been paid in. Thus, no one invested any cash in founding NVST. Rather, the partnership was created through a mere bookkeeping entry with the initial capital represented by accounts receivable. An examination *180 of the income tax returns of NVST for the years 1969 through 1973 provides evidence of the manipulative nature of NVST's treatment of the rental income from the plant.For its first 2 years, 1969 and 1970, the partnership's expenses exactly offset its income, resulting in NVST having no net income or loss. We are not convinced that this occurred coincidentally for those 2 successive years. In 1971, NVST reported a net loss of $ 20,755.36, and in 1972 and 1973, it reported net incomes of $ 70,704.27 and $ 111,634.64, respectively. The 1971 loss was distributed to NVST's general partners who had other income--Ace, Martin, Sheldon, Melvin, and Norman Bernstein--even though the partnership agreement provided that the distribution was to be made according to the proportionate share of the total capital of each partner, including the wives and children who were limited partners. The 1972 and 1973 income, in contrast, was spread among all of the members of the several Bernstein families named as partners, including numerous teenage children, and thus the income ultimately bore a lighter income tax burden. [13] This arbitrary and inconsistent manner of allocating NVST's gains or losses to *181 its partners is further evidence that the transaction was a tax avoidance scheme. Pursuant to this scheme, Milbrew purportedly paid and deducted rent to NVST in amounts shown in the table included in our Findings of Fact. No lease, however, was executed by Milbrew and NVST to establish the amount to be paid as rent. Instead, the rent was fixed annually at varying amounts sufficient to absorb most of Milbrew's reported taxable income. [14] Most of the rent was not paid in cash. As detailed in our Findings of Fact, part of the rent for the period 1969 through 1973 consisted of bookkeeping entries reflecting notes payable. No notes, however, were actually issued, and no payments were ever made to reduce these liabilities. The remainder of the rent was paid by capital improvements to the Juneau plant (thus purportedly giving Milbrew a full deduction for the cost of the improvements and NVST an equal depreciable basis for them), loans or advances to Northland, at least part of which were eventually charged on the books to reflect rent paid to NVST, and some cash. As a *182 result of these machinations, Milbrew was relieved of virtually all income taxes and the tax liabilities of the NVST partners were held to a minimum.
B. The Purported Sale Transaction's Lack of Substance
In the transaction in which the plant which had cost $ 524,236 was purportedly transferred to NVST for $ 3,000,000, neither cash nor deed changed hands. [15] NVST merely signed a land contract, which was filed away and never recorded in the local land records, and made another bookkeeping entry setting up a liability for the $ 3,000,000. As pointed out above, NVST had no assets with which to make a capital investment in the plant. The land contract called for no payment on principal for 10 years and for interest at a rate *183 far below the rate then prevailing. We simply are not convinced that the purported $ 3,000,000 "sale" without a transfer of legal title, and without the payment of any cash, to a paper entity having no tangible assets, was made with a good faith intention to transfer ownership of the plant to NVST or to cause NVST to acquire a capital investment in the plant. The parties argue at length about whether the land contract, rather than an outright deed, was sufficient to convey the Juneau plant from Northland to NVST. Assuming, arguendo, that a bona fide land contract is usually adequate for the transferee to be deemed the owner for depreciation purposes, the contract in this case contains a material error which seriously impugns its legitimacy. The contract calls for payments of $ 50,000 per year for the second 5-year period *184 following the "sale," applied first to interest at 4 percent per annum and the balance applied to principal.[16] Because $ 50,000 equals only 1.67 percent of the principal balance of $ 3,000,000, the prescribed payment did not even cover the interest due. We find it hard to believe that a genuine arm's-length contract involving amounts of such magnitude would contain such a material error. Petitioners' explanation of this error shows even more clearly the lack *185 of reality of the transaction. Ace testified that he originally drafted the land contract to call for payment of interest at the rate of 1 percent. He then became concerned that the Internal Revenue Service (presumably under section 483) would impute interest on the deferred payment unless the rate was changed. Consequently, he modified the contract in ink to provide for interest at the rate of 4 percent but inadvertently failed to alter the provisions calling for $ 50,000 payments of interest during the second 5 years. Thus, after all other terms of the agreement were agreed upon, he increased the interest scheduled to be paid on the $ 3,000,000 by $ 90,000 per year (3 percent X $ 3,000,000), or $ 900,000 over the first 10 years alone (when no principal payments were contemplated), without making any downward adjustment in the purported purchase price.Such a cavalier disregard of economic realities by all the signatories to the land contract adds weight to our conclusion that the whole arrangement was artificial. Petitioners maintain that Sheldon, Norman, and Melvin Bernstein personally obligated themselves to pay the $ 3,000,000 plus interest purchase price stated in the land *186 contract and that the transaction, therefore, had economic reality.To the contrary, however, we do not think they incurred any real risk in this respect. We do not think Ace or Martin ever intended to enforce the land contract or that anyone on behalf of NVST ever intended to pay the stated purchase price. It is technically true that one of the remedies available to the vendor under a bona fide land contract in default in Wisconsin is to obtain a personal judgment against the vendee. Nevertheless, as acknowledged by petitioners, that remedy is-- not likely to be pursued unless the purchaser has other assets which may be sold to satisfy the judgment. * * * The remedy of strict foreclosure is, however, most frequently resorted to in Wisconsin. * * * Kallenbach v. Lake Publications, Inc., 30 Wis.2d 647, 142 N.W.2d 212, 214-215 (1966). Here, Sheldon, Norman, and Melvin Bernstein had no substantial assets to pay a judgment of such magnitude, and Ace and Martin were fully aware of their relatively poor financial position. Moreover, under Wisconsin law, the general partners of NVST would be jointly, not severally, liable for the purchase price. Thus, Ace and Martin as general partners *187 of NVST, would also be personally liable along with Sheldon, Norman, and Melvin to Northland (agent for Ace and Martin) on the land contract. Wis. Stat. Ann., secs. 178.12 and 179.09 (1974); Fox Valley Builders Corp. v. Day, 71 Wis.2d 785, 238 N.W.2d 748, 750 (1976). Again, looking at the practicalities rather than the technical possibilities, the theoretical paper personal liability purportedly assumed by Sheldon, Norman, and Melvin Bernstein was virtually meaningless. We do not think any of the parties involved intended to enforce the land contract. The lack of bona fides of the 1969 sale is further demonstrated by the failure of NVST to satisfy its obligations under the contract during the first 5 years, and the failure of Northland (or Ace and Martin), as the obligee, to take any action to attempt to obtain compliance or to foreclose. Although the land purchase contract required NVST to make annual interest payments in the amount of $ 120,000, a total of $ 600,000 over the 5-year period, only the following amounts were paid: 1969
1970
16,950.75
1971
27,500.00
1972
35,049.92
1973
57,599.92
Total
$ 137,100.59 No efforts were made to collect the delinquent amounts. On the contrary, Ace, *188 who dominated all of these related entities, rendered NVST impotent to make any significant portion of the payments specified by the land contract by directing substantial expenditures for capital improvements at the Milbrew plant and by having Northland withdraw from NVST $ 82,000 in 1972 and $ 177,000 in 1973 as cash advances. [17] *189 Although NVST's continuing default meant that Ace and Martin could have rescinded or canceled the purported land contract at any time and reacquired the plant, they instead chose to continue to reap the tax benefits claimed to have been created. Thus, petitioners' attempts to establish that the plant had been transferred in a bona fide arm's-length sale are seriously undermined by their subsequent lack of observance of their respective rights and obligations under the land contract during the first 5 years of its operation. C. The Inflated Sales Price
Furthermore, we find that the $ 3,000,000 figure was a gross exaggeration of the plant's fair market value on January 1, 1969, and that this exaggeration, designed to provide an artificially inflated cost basis for the plant, is one further piece of evidence showing the lack of bona fides, the sham nature, of the purported sale of the Juneau plant to NVST. The alleged resale of the plant within 20 months to a related party for nearly 6 times the price paid for it in May 1967 strains credulity. Cf. Thompson v. Commissioner, 66 T.C. 1024, 1051 (1976), affd. 631 F.2d 642 (9th Cir. 1980). We find that the plant's 1969 value was approximately the same as the 1967 purchase price. Much expert testimony was presented to justify the $ 3,000,000 figure. That testimony, however, was based on the proposition that there were no sales of comparable plants during the crucial time period and that, consequently, the value should be measured by the estimated cost of replacing the plant and its equipment, adjusted for depreciation *190 and obsolescence. To the contrary, the evidence is undisputed that in 1967 and continuing through 1972, there were many processing plants, previously used in the dairy industry, for sale throughout the Wisconsin area. These plants were selling in the $ 400,000 to $ 600,000 range based on their net book values. The cost approach ignores the depressed market at that time for processing plants and therefore does not reflect the price an arm's-length buyer would have been willing to pay in 1969. We think the arm's-length market for the Juneau plant in 1969 would have been determined in the light of the general availability of numerous basically similar plants for purchase at book value, not by the replacement cost of the Juneau plant itself.Accordingly, we are not persuaded that the $ 3,000,000 purported sale price had any realistic relationship to the fair market value of the plant on January 1, 1969. [18] *191 Petitioners argue that the 1969 value of the Juneau plant was greater than its 1967 value because in 1969 it was rented to Milbrew, a going business, and was producing substantial rent. We do not think that the value of the plant was increased six-fold by merely moving the operations of a related entity, Milbrew, into the plant. Those operations could be moved out at any time. No written lease was executed obligating Milbrew to remain in the plant or to pay any stated *192 amount of rent. In fact, such an obligation would have had little value because, as reflected in the balance sheets attached to Milbrew's income tax returns for all those years, Milbrew had a regative net worth. Moreover, in 1969, Milbrew paid no rent. Although Milbrew deducted $ 220,000 as rent, it merely set up that amount on its books as a payable account without issuing any notes or paying any cash. We do not think a willing buyer and a willing seller, both reasonably well informed as to the facts, would have given much weight to Milbrew's occupancy of the plant on January 1, 1969. Our finding as to the fair market value of the plant is also supported by petitioners' own statements. When the State taxing authorities were reviewing the value of the Juneau plant for local tax purposes subsequent to the years in issue, Ace vigorously argued orally and by letter, as our findings point out, that the May 1967 purchase price represented its fair market value. He emphasized that the plant was old and deteriorating and that any general increase in real estate values was offset by continuing depreciation. Ace insisted that the Antigo plant, which he and his associates had brought for *193 $ 403,310.53 in 1974, was comparable in value to the Juneau plant. Petitioner would have us disregard Ace's testimony on the theory that it relates to the assessed value for real estate tax purposes and not to the fair market value of the plant.Ace's testimony before the State authorities and his letters, however, refer to the fair market value of the plant, not to some different concept of assessed value. As a Wisconsin attorney, he was no doubt familiar with, and reared his testimony to, the rule stated in State v. City of Evansville, 1 Wis.2d 40, 82 N.W.2d 899, 900 (1957), as follows: For tax purposes property must be assessed at its fair market value. * * * The fair market value of the property is the amount for which it will sell upon negotiations resulting in a sale between an owner willing but not obliged to sell and a willing buyer not obliged to buy. See also Rosen v. City of Milwaukee, 72 Wis.2d 653, 242 N.W.2d 681, 684 (1976); State v. City of Cudahy, 45 Wis.2d 683, 173 N.W.2d 627, 629 (1970). That is the standard of fair market value which we think Ace applied in his testimony and letters to the State taxing authorities and which must be applied in the instant case. We *194 are satisfied that if NVST had been an unrelated party dealing at arm's-length, it would not have contracted on January 1, 1969, to buy the Juneau plant for a price anywhere near $ 3,000,000. In the light of the whole trial record, we accept the truthfulness of Ace's letters and his testimony before the State taxing authorities as to the plant's fair market value. That testimony was given before the present controversy arose, and we have no reason to think it was not given in good faith. We recognize, as petitioners seem to argue, that a low valuation of the property served Ace's interests in that it reduced the taxes payable on the property, but we are not prepared to ascribe to him a deliberate effort to mislead the State authorities. [19]
D. Petitioners' Subsequent Treatment of the Ownership of the Property
Finally, *195 the lack of bona fides of the purported sale is confirmed by petitioners' subsequent treatment of the transaction. The failure to record the January 1, 1969, land contract in the local land records enabled Ace and Martin, through Northland, to continue to treat the Juneau plant as their own and to represent to outside parties that they were its owners. [20] *196 For example, in a 1969 lawsuit against Northland, Northland specifically admitted, in a verified pleading signed by Martin and notarized by Ace, an allegation that it was the owner of the property. An adverse judgment in that suit if recorded would, of course, have been a cloud on the title ahead of the unrecorded land contract. Also, in 1972, Northland executed a mortgage on the Juneau plant to the Bank of Commerce as security for credit in the amount of $ 600,000. The bank official who handled the loan testified that the bank relied upon the title to the Juneau plant as reflected by the land records.The mortgage recited that Northland "covenants that it has good right to sell and convey said premises and that they are free from encumbrances and hereby warrants title thereto." No reference was made in the mortgage to the purported land contract sale to NVST. NVST was neither a party to the mortgage, nor were any entries made in NVST's books to reflect the mortgage debt. [21] Thus, Ace and Martin used the plant as their own. When Milbrew filed its 1972 application with the U.S. Treasury to register the Juneau plant as a distilled spirits plant, all parties having an interest in the property were required to execute forms consenting *197 to the subordination of their interests to any future Federal tax liens for unpaid distilled spirit taxes. The application reflected Northland as "owner of fee simple title," (not merely as titleholder, as petitioners argue) of the plant and the Bank of Commerce as mortgagee. Both Northland and the bank consented to the subordination. Although Ace and Martin, who signed the forms on behalf of Northland and Milbrew, respectively, were also general partners of NVST, the application did not show any interest of NVST in the property. [22] *198 Our Findings of Fact also contain a detailed description of a series of encounters between Northland and State and local officials concerning the real estate tax assessment on the Juneau plant. In these encounters, Ace repeatedly represented that Northland was the owner of the plant and described Milbrew as "our lessees." The State taxing authorities became aware of Northland's purported sale of the plant of NVST but disregarded it when Ace assured the appraiser that the plant was really owned by Northland. [23] Under Wisconsin law, had the land contract sale been bona fide, the real estate taxes would have been assessable against NVST, not Northland, on the basis of the plant's fair market value. Schrader v. Otto, 238 Wis. 469, 300 N.W. 255, 257 (1941); Ritchie v. City of Green Bay, 238 Wis. 469, 254 N.W. 113, 115 (1934); Williamson v. Neeves, 94 Wis. 656, 69 N.W. 806 (1897); see also Mitchell Aero, Inc. v. City of Milwaukee, 42 Wis.2d 656, 168 N.W.2d 183, 185-186 (1969); Mueller v. Novelty Dye Works, 273 Wis. 501, 78 N.W.2d 881 (1956). *199 Moreover, the land contract signed on January 1, 1969, expressly provides that NVST "will pay, when due and payable, all taxes and assessments which have been assessed or levied" upon Northland's interest in the property. Nevertheless, the burden of the payment of the real estate taxes never shifted to NVST. Milbrew deducted the real estate taxes for 1969 through 1973, and Ace and Martin deducted the real estate taxes on the plant for 1975 through 1977. Thus, again, the purported land contract sale was ignored, and Ace and Martin treated the plant as their own property. In summary, in the light *200 of the totality of the evidence before us, we find that the purported sale of the Juneau plant on January 1, 1969, to NVST lacked substance and business or economic reality and was a sham. We believe the purported sale was merely a paper scheme to avoid taxes and was not a bona fide transaction. The burdens and benefits of ownership never shifted. The parties did not intend in 1972 and 1973 either to be bound by or to enforce the land contract. Thus, the contract did not reflect the "cost" of the Juneau plant; nor did it give NVST an investment in the plant. Therefore, we sustain respondent's disallowance of the depreciation deductions claimed by NVST on the plant. 2. Interest Payments on NVST's Land Contract
NVST claimed deductions of $ 35,049.92 and $ 57,599.92 in 1972 and 1973, respectively, as interest paid pursuant to the land contract with Northland. Respondent disallowed these deductions on the ground that there can be no interest deduction under section 163 unless there is a bona fide indebtedness, Knetsch v. United States, 364 U.S. 361, 369 (1960), and the obligation of NVST pursuant to the alleged purchase of the Juneau plant was not a bona fide indebtedness which will *201 support a section 163 interest deduction. For the reasons discussed above in connection with the principal issue of depreciation of the Juneau plant, we sustain respondent's determination on this issue. See Thompson v. Commissioner, 66 T.C. 1024 (1976), affd. 631 F.2d 642 (9th Cir. 1980). 3. Milbrew's Rent Deduction for the Juneau Plant
In 1972, Milbrew deducted $ 410,963 as rent for the Juneau plant. In 1973, it deducted $ 532,650. Milbrew also deducted $ 9,999.96 in 1972 and $ 21,900.04 in 1973 as rent for equipment purportedly owned by the EMMNS venture. Respondent disallowed the full amounts claimed with respect to the EMMNS equipment and all but $ 120,000 in 1972 and $ 150,000 in 1973 with respect to the Juneau plant. [24]
Respondent contends that the amounts claimed as rent are excessive and unreasonable and, therefore, constituted a distribution of Milbrew's earnings. Respondent observes that the rent was arbitrarily determined each year by Ace at an amount that would leave Milbrew with only nominal taxable income. Respondent *202 concludes that because of this manipulation, the rent is not fully deductible. Alternatively, respondent contends that the amounts claimed were not "paid" within the meaning of section 267. We note that for the years in issue, Milbrew's sales increased every year to a high of almost $ 3,000,000. Nevertheless, Milbrew's taxable income as reported never exceeded $ 8,300, due mainly to the deductions for rent claimed on the returns. Given the common ownership of the entities involved, we think it clear that the amount of rent paid by Milbrew to NVST was based upon the parties' desire to maintain a low level of income for Milbrew and was, in part, a distribution of its earnings. This conclusion is further supported by the fact that a large portion of the rent expense claimed consisted of bookkeeping entries which were never actually paid. In determining the reasonableness of the rent, however, the proper focus should be upon the fair rental value of the plant, rather than the method used to determine the rent. See Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953). If petitioners can establish that the amounts *203 deducted were reasonable compared to the market rate, the method used in arriving at those amounts is irrelevant for the narrow issue of deductibility under section 162. At trial, both parties presented appraisal reports and testimony supporting their respective positions. Petitioners' expert computed rent for the building as if it were vacant and then added rent for the machinery. Based upon rent paid by one other company for a vacant building, which, we think, was not comparable, petitioners' expert derived a rental value for the building of $ 1.47 per square foot. For the machinery, he arrived at a rent value measured by 13 percent of the cost of replacing the equipment with allowances for obsolescence and depreciation. We do not find this theoretical approach convincing. It assumes that all of the Milbrew plant space was useable and of the same quality. To the contrary, however, the record indicates that much of the plant space was not useable and that the quality varied greatly. We also do not think the replacement costs of the equipment provides any reliable guide to its fair market value in the light of the conditions existing in Wisconsin in 1972 and 1973. We find it *204 incredible that this plant, even with the new equipment added after its purchase, could be rented annually for almost as much as it cost to buy in an arm's-length transaction in May 1967. Respondent's witness pointed out that the rental arrangement was a net lease where the owner had no expenses.He determined that a return of 14-16 percent on the investment in the Juneau plant was reasonable. He arrived at a fair rental by applying this percentage to the total investment, including the additional equipment placed in the plant after it was purchased in 1970-1973. This approach, we think, is reasoinable. [25] Thus, we hold that petitioners have not shown error in respondent's determination of Milbrew's deductible rent for the plant and equipment. [26] *205 4. Investment Credit
In 1972 and 1973, NVST acquired equipment which was placed in the Juneau plant. NVST has claimed an investment credit on the equipment in the amounts of $ 41,027.51 in 1972 and $ 257,378.76 in 1973. [27] Respondent disallowed the entire amount of the credit claimed for each year. To be entitled to claim the investment credit on the equipment installed in the plant leased to Milbrew, petitioners must establish that the section 162 deductions with respect to the equipment exceeded 15 percent of the rental income from equipment during the first 12 months of the respective lease periods. Sec. 1.46-4(d)(1), Income Tax Regs.[28] *206 Additionally, petitioners must prove that the term of the lease is less than one-half the estimated useful life of the equipment. Respondent contends that neither requirement has been met. [29] We agree with respondent that petitioner has failed to show that the 15 percent requirement of section 1.46-4(d)(1), Income Tax Regs., has been met. The record does not indicate the dates upon which the equipment in question was transferred to the lessee, Milbrew. Consequently, *207 petitioners have not established either the amount of rent or the amount of section 162 expenses attributable to the equipment during the first 12 months after the equipment was transferred to the lessee. Although petitioners refer to the amounts of rent income and deductions for the calendar years 1972 and 1973, the correct period is the 12 months following the transfer to the lessee. The income and expenses for the respective calendar years simply are not relevant. In addition, even if the calendar years 1972 and 1973 were the appropriate period for making the computations, there is nothing in the record which shows a breakdown of the total rental income or section 162 expenses between the new equipment in question and the rest of the Juneau plant. The stipulated amounts for 1972 and 1973 are lump sums relating to the entire plant. Petitioners have failed to introduce any evidence establishing the amounts of income and expenses relating only to the equipment in question. Petitioners argue that they are not required to show the exact income and expense amounts because they have properly apportioned the rental income based upon the ratio of the cost of the equipment to the total *208 cost of the plant and equipment. See sec. 1.46-4(d)(3)(i), Income Tax Regs.[30] *209 Petitioners, however, have not applied the method consistently because, although they apportioned the income in that manner, [31] *210 they make no similar apportionment of the section 162 expenses. To the contrary, they attempt to satisfy the 15-percent test by comparing the deductible expenses attributable to the entire plant as a percentage of that portion of the rental income allocated to the equipment alone. This clearly does not constitute a "reasonable method selected and consistently applied." See sec. 1.46-4(d)(3)(i), Income Tax Regs. Finally, petitioners argue that there were certain additional expenditures in 1972 and 1973 which should be included as section 162 expenses for purposes of applying the 15-percent test even though these amounts were not originally claimed as section 162 deductions in the 1972 and 1973 returns. After examining the record, we are unconvinced that there were business deductions available in 1972 and 1973 which were not claimed. We need not decide this issue, however, because even if the amounts referred to by petitioners are deemed allowable section 162 deductions, the petitioners still have failed to meet the 15-percent test on the grounds discussed above. [32]
5. Commitment Fee
During 1972, some of the petitioners formed a joint development venture which paid a $ 9,000 commitment fee to Badger, a savings and loan association, in connection with a mortgage loan made to the venture. Petitioners claimed *211 the fee as an interest expense deduction in 1972. Respondent disallowed the entire deduction, determining that the fee was a cost of obtaining the loan, rather than interest, and thus must be amortized over the life of the loan. We hold for respondent on this issue. Under section 163(a), a deduction is allowed for all interest paid or accrued on indebtedness within the taxable year. Whether or not a "fee" of the type at issue here constitutes additional interest or payment for services depends upon what, under the specific circumstances present, was actually received for the money paid. L-R Heat Treating Co. v. Commissioner, 28 T.C. 894, 897 (1957); Lay v. Commissioner, 69 T.C. 421, 437-439 (1977). Petitioners have the burden of proving that the $ 9,000 was interest rather than a fee paid for services. Petitioners' only argument supporting their position is that because they were charged separately for an appraisal and a credit report, the $ 9,000 "fee" could not have been for those services and therefore must have been interest. We find this argument unpersuasive. The appraisal and credit report were not necessarily the only services which the lender might have performed. *212 Indeed, the record indicates that Badger had performed a substantial service by organizing a group of lenders, who collectively were able to make a single sizable loan that petitioners might not have been able to obtain from any one of them individually. Petitioners have introduced no other evidence establishing their claim that no services were performed for the $ 9,000 fee, and that the payment represented interest. There is no evidence that the stated interest rate on the loan was below prevailing market rates, or that the nature of their loan (due to the degree of risk or otherwise) justified additional interest above the stated rate, in the form of a prepaid "fee." Thus, petitioners have failed to prove that they are entitled to an interest deduction, and we sustain respondent's determination that the payment was an expense of obtaining the loan, amortizable over the life of the loan. 6. Like-Kind Exchange
Section 1031[33] *213 provides that an exchange of like-kind property held for use in a trade or business or for investment is a non-taxable event. Conveyances for money or other property not of like kind do not qualify for this tax-free treatment. Respondent contends that the transfer of the Center Street property does not qualify as a tax-free exchange under section 1031 because the consideration received was cash rather than like-kind property. Respondent further argues that there could not have been an exchange because the persons acquiring the N. Maryland property (Ruth and Eva Bernstein) were not the transferors of the Center Street property (Ace, Martin, and Brown's estate). Petitioners argue that Ruth and Eva Bernstein were the true beneficial owners of the Center Street property and that Ace and Martin were acting merely as their nominees and agents. *214 Although petitioners admit that cash was received at the closing, they argue that because this money was immediately applied toward the purchase of the N. Maryland property, the transaction was in substance an exchange. Citing Starker v. United States, 602 F.2d 1341 (9th Cir. 1979); Biggs v. Commissioner, 69 T.C. 905 (1978), affd. 632 F.2d 1171 (5th Cir. 1980); Coupe v. Commissioner, 52 T.C. 394 (1969), petitioners argue that the courts have consistently interpreted section 1031 broadly and that the transaction here comports with the policy underlying section 1031. Thus they conclude that the transactions qualify as a tax-free like-kind exchange. Generally, courts look to the substance of the transaction rather than its form when analyzing a purported section 1031 exchange of property. Crenshaw v. United States, 450 F.2d 472, 475 (5th Cir. 1971), cert. denied 408 U.S. 923 (1972); Biggs v. Commissioner, supra at 914. Thus, in the cases cited by petitioners, each court concluded that, regardless of the actual structure of the transaction, ultimately an exchange of properties occurred. See, e.g., Biggs v. Commissioner, supra at 913-914.
In contrast, in the case before us there was *215 no exchange of properties. Here, the sellers received money for their property and then, in an independent transaction, used the sale proceeds to purchase other property. "The very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property." Carlton v. United States, 385 F.2d 238, 242 (5th Cir. 1967). These transactions were not interdependent parts of an overall plan. The cash received by petitioners was not restricted in use to the purchase of like-kind property. Hence, merely because petitioners subsequently elected to reinvest the proceeds of their sale in like-kind property does not transform what otherwise would constitute a sale and independent purchase into a qualifying exchange within the meaning of section 1031. Carlton v. United States, supra at 241; Trenton Cotton Oil Co. v. Commissoner, 147 F.2d 33, 36 (6th Cir. 1945), revg. and remg. a Memorandum Opinion of this Court; Swain v. United States, 651 F.2d 1066 (5th Cir. 1981). To hold otherwise would render meaningless the fundamental requirement of section 1031 that there be an exchange. [34] *216 7.Equipment Depreciation by EMMIS
EMMNS, a joint venture consisting of the five general partners of NVST, purportedly purchased certain equipment from NVST in 1972 and 1973. The general partners claimed depreciation deductions on the equipment during those years. Respondent disallowed those deductions on the grounds that the purported equipment sale was a sham and determdined that the rent income was properly allocated to NVST. We agree. The sole economic consequence of the transaction for the EMMNS partners was a net tex loss through the creation of depreciation deductions in excess of the paper rent income. No cash changed hands upon the "purchase" by EMMNS, which executed a note for the entire purchase price, nor upon the resale back to NVST, which merely canceled *217 the balance of the purchase-money note. Thus, the EMMNS partners, during the period of purported ownership, had no net cash income or outflow. In addition, no gain or loss on the sale was reported by NVST because the "sale" of the equipment to EMMNS was for an amount exactly equal to NVST's depreciated basis. Petitioners have failed to introduce evidence proving that this amount represented the true fair market value of the equipment at the time of the "sale." [35] We find it difficult to believe that NVST, or anyone else, would have entered into a bona fide arm's-length transaction on the terms detailed in our Findings of Fact. Indeed, petitioners have not attempted to establish otherwise. Petitioners attempt to justify the EMMNS transaction as a legitimate means of providing additional compensation to the general partners of NVST. Martin testified that the "sale-lease-back" transaction was created to indirectly increase the compensation of certain partners, without paying additional cash, by providing them with greater income tax deductions. Citing Gregory v. Helvering, 293 U.S. 465 (1935), petitioners conclude *218 that they have the right to arrange their affairs in a manner which produces favorable tax consequences, and that their scheme therefore was legitimate tax planning. Although it is clear that taxpayers are given wide discretion in the arrangement of their affairs, it is well established that an artificial transaction having no economic substance and devised solely to avoid taxes is a sham and without effect for Federal income tax law purposes. See Knetsch v. United States, 364 U.S. 361 (1960); Gregory v. Helvering, supra. Accordingly, we sustain respondent's disallowance of the depreciation deductions claimed by the EMMNS partners and the reallocation of the equipment rent income to NVST. 8.$ 225,000 Issue
NVST depreciated certain properties at a rate of 4.8 percent, using a total depreciable basis of $ 718,647. Respondent determined that the proper rate was 3 percent, and that the proper depreciable basis was $ 493,647. Petitioners have not addressed respondent's determination, nor have they introduced any evidence, as to the proper rate. Thus, we hold that petitioner has failed to prove that respondent's determination of the proper depreciation rate was erroneous. Consequently, *219 the only dispute with regard to this issue is whether NVST paid consideration for the interest in the properties in addition to the assumption by NVST of liabilities encumbering the properties. Petitioners contend that NVST's depreciable basis in the properties exceeds the amount determined by respondent by $ 225,000. Petitioners observe that prior to May 26, 1970, Milbrew paid amounts totaling $ 206,689.03 to the Bank of Commerce and the American City Bank. Petitioners argue that these payments were made on loans from the banks to Northland Development Co. (ND Co.). [36] Petitioners further argue that these payments were credited by Milbrew against its rental payments to NVST, and that accordingly an indebtedness arose between ND Co. and NVST. When NVST purchased its interests in the properties from Ace, Martin, and Cunningham, according to petitioners, the debt was forgiven as part of the purchase price. [37] *220 We are not persuaded by petitioners' arguments. Although petitioners contend that Milbrew made the payments on behalf of NVST, thereby creating a loan to ND Co. from NVST, petitioners admitted both at trial and in their briefs, and the record indicates, that no notation of this purported loan was recorded on NVST's books. Moreover, the evidence does not show that this obligation was recorded on ND Co.'s books, nor does it show that any note or other writing exists which evidences the purported loan. [38] We find it difficult to believe that a loan of this magnitude would not be reflected either in the books of the lender or the borrower, or by issued notes or other written evidence of the obligation. In addition, petitioners argue that in essence Milbrew paid the $ 206,689.03 to ND Co. and that this payment *221 constituted rent to NVST for the Juneau plant. However, the only "rent" paid by Milbrew to NVST in 1969 was via a $ 220,000 bookkeeping entry, which was unconnected to the transaction at issue here. Although NVST reported the $ 220,000 as rent income in its 1969 Federal income tax return, it did not report any additional amount, including the payments purportedly made by Milbrew to ND Co. on behalf of NVST. [39]
We have held that Ace and Martin, through their agent Northland, rather than NVST, was the true owner of the Juneau plant. Accordingly, when Milbrew made the payments to the banks on ND Co.'s loans, those payments cannot be considered rent to NVST for the Juneau plant. [40] *222 Thus, absent any other indication that a loan had been made to ND Co. by NVST, the payments by Milbrew did not in themselves create an obligation to NVST by ND Co.As discussed above, there is no other credible evidence that NVST had loaned ND Co. an amount which was subsequently forgiven as part of the purchase price of the interest in the properties. Finally, we find petitioners' theory unpersuasive because, if that theory were true, the consideration received by each seller would be unrelated to the interest sold by him. Although the property interests acquired by NVST were purchased from Ace, Cunningham, and Martin, ND Co. was owned equally by Ace and Cunningham. Thus, upon NVST's supposed forgiveness of debt owed by ND Co., only Ace and Cunningham would be benefited, and Martin would receive no consideration for his interest. The record does not reflect that Martin received other consideration to compensate for this. Additionally, although ND Co. was owned equally by Ace and Cunningham, the facts indicate that Cunningham sold a larger interest in the properties than did Ace. Thus, upon the purported forgiveness of debt, Ace would have received the same consideration as did Cunningham while giving up a smaller interest in the properties. We conclude, therefore, that petitioners have failed to prove that NVST had a depreciable basis in the properties in an amount *223 greater than that determined by respondent. [41] *224 9. Depreciation of Other Buildings
A. N. Farwell
Respondent initially disallowed the depreciation deductions claimed by petitioners with respect to this property because they used the component method of determining depreciation, and recomputed the depreciation using a 35-year composite life. Respondent now concedes that the component method is a permissible method of computing depreciation on used real property. See Fieland v. Commissioner, 73 T.C. 743, 752 (1980). Nevertheless, respondent contends that petitioners have failed to establish the depreciable cost bases and useful lives of the respective components. Generally, a purchaser of used real property is not entitled to use the component method of depreciation because a precise determination of the cost to the purchaser of the individual components cannot be made. See e.g., Lesser v. Commissioner, 42 T.C. 688, 704-706 (1964), affd. 352 F.2d 789 (9th Cir. 1965), cert. denied 384 U.S. 927 (1966). *225 The component method may be used, however, to determine depreciation on used real property "if the cost of acquisition is properly allocated to the various components based on their value and useful lives are assigned to the component accounts based on the condition of such components at the time of acquisition." Fieland v. Commissioner, supra at 752; Rev. Rul. 73-410, 1973-2 C.B. 53. The only evidence introduced by petitioners on this issue is the testimony of petitioner Cunningham, a mechanical engineer and an experienced builder of apartments. He also as one of the co-owners of he property. Cunningham testified that at the time the property was acquired, he and Martin made a thorough inspection of the building and its components. Cunningham then made computations as to the original 1967 cost of each component based upon his experience and knowledge gained from his construction of comparable buildings at that time. The ratio of the 1967 cost of each component to the total component costs was then computed and this ratio applied to the total 1972 cost of the building to establish the proportion of such total deemed to be the cost of each component. Unfortunately for petitioners, *226 this method of allocating component costs is not based upon the value of the components at the time of acquisition (1972). Cunningham did not attempt to directly value the various components as of the 1972 purchase date, and he has failed to demonstrate that the values of the various components bore the same relationship to the total building value in 1972 as the costs of such components bore to the total building value in 1967. See Lesser v. Commissioner, supra at 705. In addition, although Cunningham testified on the useful lives assigned to various components, his testimony does not indicate how those lives were determined. We do not think his testimony adequately establishes that the proper useful lives were assigned to the components based upon the condition of the components at the time of acquisition. Accordingly, we conclude that petitioners have failed to establish that they properly used the component method to determine depreciation, and respondent's recomputation is sustained. B. Maryland Avenue
In computing depreciation on the building at 2727 N. Maryland Avenue, petitioners used the component method, and respondent has accepted their allocation of costs to the various *227 components. Respondent, however, has challenged the useful lives assigned to several components, increasing the life assigned to certain walls from 33-1/3 years to 50 years, and increasing portions of the electrical and plumbing systems from 25 years to 50 years.petitioners, in their amended petition, reduced the useful life of the roof from 20 to 15 years.
Petitioners have introduced the testimony of Cunningham to support their claims. He testified that the N. Maryland Avenue apartment building, a 3-story structure, was designed and constructed to last only 25 years on the premise that at the end of the 25-year period the building would be demolished and used to build a high-rise apartment building. Petitioners conclude, therefore, that the proper useful life of the components is 25 years. We are persuaded by Cunningham's testimony on this issue. Thus, we hold that petitioners have proved that respondent erroneously increased the depreciable useful lives of the components of the 2727 N. Maryland Avenue building. [42] *228 C. Other Properties
Petitioners have conceded on brief that the change to the straight-line component method of depreciation for the Teutonia Avenue, W. Janesville, Greenfield, North Avenue, and Auer properties constituted a change in accounting method requiring the consent of the Commissioner. See section 446(e) and section 1.446-1 (e)(2), Income Tax Regs. Respondent's consent was not obtained, and therefore respondent's adjustment of the 1972 and 1973 depreciation back to the original composite method with respect to these properties must be sustained. Respondent allowed the component method to be used for the N. Oakland and N. Frederick properties, but determined that certain costs from components being depreciated at 3 and 4-percent rates were properly allocated to the building shell, which was being depreciated at a 2-percent rate. We find petitioner Cunningham's testimony about these buildings convincing. Thus, we hold that petitioners have shown that respondent's adjustments *229 with regard to these buildings were in error. 10. Accrued Interest
Respondent contends that the so-called accrued interest is not deductible by NVST because NVST was a cash basis taxpayer, [43] or, alternatively, that the deducted amount represented a "guaranteed payment," pursuant to section 1.707-1(c), Income Tax Regs., and, as such it must be included in the partners' distributive shares of income for the same year in which the partnership claimed the deduction (1973). Under either theory, respondent increased each partner's 1973 individual taxable income by his pro rata share of the $ 15,764.02 at issue. We think it clear that NVST, as a cash basis taxpayer, may not deduct this amount as an interest expense. No interest was paid, nor was any expense actually incurred. Rather, the "expense" existed only as an entry on the capital accounts of NVST. [44]
11. Conceded Issues and Automatic Adjustments *230 Petitioners have conceded certain issues originally raised in the pleadings, including the timeliness of the statutory notice of deficiency to Milbrew, constructive receipt by NVST of $ 2,500 from Northland, and substantiation of various travel expense deductions claimed by Ace and Cunningham. Respondent has allowed petitioners Howard and Barbara Bernstein unclaimed dependency exemptions. Consistent with his contention that NVST did not have a depreciable interest in the Juneau plant, respondent has allowed depreciation deductions to Ace and Martin, based upon the original purchase price of the plant from PMA. [45]
Certain adjustments to the taxable income of various petitioners are conceded by petitioners and respondent as automatic adjustments, based upon the determination of the other issues. These automatic adjustments include the entitlement of various petitioners to additional medical expense deductions, standard deductions or additional standard deductions, and additional sales tax deductions. To reflect *231 the foregoing, Decision will be entered under Rule 155. Footnotes
1. This case was heard before Judge William H. Quealy. He subsequently resigned from the Court, and the case was reassigned to Judge Featherston. The parties appeared before Judge Featherston↩ on Apr. 14, 1980, and July 31, 1981. Neither party moved for a retrial of the case, in whose or in part.
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
3. Ace and Martin are brothers. Their sister, Selma Bernstein, is the mother of Norman and Melvin Bernstein, who are, therefore, nephews of Act and Martin. Sheldon Bernstein is a cousin of Norman and Melvin Bernstein. We note that the interests are divided so that each of the five family groups have 20 percent of the partnership interests.
4. The use of terms such as "purchase," "sell," "own," "transfer," "acquire," "note," "interest," "rent," and derivations thereof in the Findings of Fact is for narrative convenience only, and is not intended to represent any factual conclusion concerning the true nature of the transactions discussed, the bona fides of which are at issue herein. This caveat applies to other issues as well as issue 1. 5. It should be noted that an annual payment of $ 50,000 represents only 1.67 percent of the principal amount of $ 3,000,000. Thus, the payment is insufficient to cover the prescribed interest, and none of the payment can be attributed to principal.↩
1. Entered as "notes payable" on Milbrew's books. No notes were actually issued and no payments were made to reduce these liabilities. ↩
2. Petitioners contend that these advances effectively became loans from NVST to ND Co., a noncorporate entity equally owned by Ace and Cunningham. No notes wer issued or entries made on the books of NVST to reflect the 1972 "loan." The $ 177,000 advance, treated as rent in 1973, was originally advanced to ND Co. in 1972 as a loan from Milbrew.In 1973, the loan receivable was transferred to NVST and applied as a rent payment. This "loan" was recorded on the books of NVST. ↩
3. The rent to NVST in 1972 and 1973 was less than the total rent expense deductions claimed in those years: $ 425,763.67 and $ 559,350.04, respectively.↩
1. The difference between these amounts, shown in NVST's 1972 and 1973 returns, and the amounts stipulated by the parties as the total rent "paid" by Milbrew for the Juneau plant for those years (see preceding table) is not explained by the record. ↩
2. Rent income for properties other than the Juneau plant is net of related expenses, other than depreciation, which is separately shown. ↩
3. Interest deductions identified in the NVST returns as "Bernstein & Bernstein" represent interest pursuant to the Jan. 1, 1969, land contract signed by Northland and NVST.↩
6. The form reflected an encumbrance of $ 375,000 dated Oct. 1967, and an encumbrance of $ 400,000 dated Nov. 1972. The balance due as of Dec. 7, 1972, was shown as $ 344,186.38.↩
7. On the 1975 return, the preprinted address label was in the name of "NVST (Milbrew, Inc.)." This was lined through and the name Northland Developers, Inc., written in.
8. Although both petitioners and respondent state in their briefs that the participants in the venture were Martin and Ruth Bernstein, Ace and Eva Bernstein, David Cunningham and NVST, the documents in evidence on this issue reflect only the names of Ace and Cunningham.↩
1. This property subsequently became the subject of litigation as to ownership which litigation was not concluded as of Mar. 30, 1979.
9. For those properties in which NVST acquired an interest greater than 12 percent, it is unclear from the record how the remaining interest was divided between Ace, Martin, and Cunningham.↩
10. Respondent did not change the venture's separate depreciation of appliances, carpet, and furniture. In an amended petition, petitioners have claimed an overpayment based upon entitlement to depreciation on the property at a rate greater than that claimed in their original returns.↩
11. Because of our holding, we do not reach respondent's alternate contentions for disallowing the deductions. ↩
12. It is stipulated that although Northland took title to the Juneau plant in May 1967 and is shown as vendor in the Jan. 1, 1969, land contract, it was acting as agent for Ace and Martin. For convenience, we shall refer in this opinion from time to time to Northland, but such references are intended to apply to its status as agent in respect of the ownership and purported transfer of the Juneau plant.↩
13. As detailed in our Findings of Fact, the interest of each general partner and his immediate family was 20 percent.↩
14. Ace testified at one point: Q. All right. And how did you make that determination [of the amount of rent to be paid by Milbrew]? A. On what we judged was the ability to pay and keep them alive. At another point he testified as to the amount of the rent: It was probably a month or two after they were in operation, so we could see how much they could pay. It wasn't a matter of getting what it should bring. It was a matter of what could they pay and still live.↩
15. The record does not disclose how or whether Ace and Martin reported the 1969 sale of the plant on their Federal tax returns. We note that the general rule is that a cash basis vendor under a land sale contract does not realize gain on the sale until he has recovered tax-free his basis in the property. See, e.g., Ennis v. Commissioner, 17 T.C. 465, 469-470↩ (1951).
16. The provision in the land contract is as follows: Payment of interest only for first sixty months. Said interest in the sum of 4% per annum payable on the 10th of each and every month. Commencing with the Sixty first month for the succeeding sixty months payment shall be at the rate of $ 50,000 per year in equal monthly installments of $ 4166.66, consisting of interest at 4% per annum and the balance to apply on principal. Commencing with the 121st month and for 120 months thereafter, payment shall be at the rate of $ 300,000 per year in equal monthly installments of $ 25,000 per month. Consisting of interest at 4% per annum and the balance to apply on principal, the residual balance to be due and owing on the 241st month.↩
17. Although Milbrew actually paid for the improvements and advanced the cash to Northland, petitioners argue that it did so on behalf of NVST and that therefore the payments constitute rent to NVST with NVST constructively paying for the improvements and making the cash advances. We note that in this manner, Ace was able to withdraw, tax-free, substantial amounts of cash while simultaneously attempting to give Milbrew tax benefits in the form of rent expense deductions.
18. Both respondent and petitioners offered the testimony of experts who valued the plant on the basis of the estimated cost of replacement adjusted for depreciation and obsolescence. We do not find that expert testimony convincing. Toronto, Hamilton & Buffalo Nav. Co. v. United States, 115 Ct. Cl. 835, 88 F.Supp. 1016 (1950); Sternberger v. United States, 401 F.2d 1012, 1016, 185 Ct. Cl. 528, 535 (1968). We think petitioners err in their contention that Judge Quealy↩ in effect made a finding as to the value of the plant. Indeed, respondent offered, as the last witness of the trial, the testimony of an engineer agent whose valuation report was received in evidence. His report takes much the same approach as Ace took before the Wisconsin State tax authorities, i.e., that the Juneau plant was one among many basically similar plants for sale in 1969 at book value and that the May 1967 price reflects the price at which informed willing buyers and willing sellers would have traded on Jan. 1, 1969. We think this is the most reasonable approach.
19. We are aware that the assessed value of real property is usually regarded as an unreliable guide to its fair market value. We do not, however, rely upon the State taxing authorities' findings of value. Rather we conclude that, in the light of the whole record, Ace's statements to the State authorities provide a reasonable guide to the plant's Jan. 1, 1969, value.↩
20. We do not question that a bona fide unrecorded land contract may be valid as between the parties.See State v. Bark doll, 99 Wis.2d 163, 298 N.W.2d 539, 540 (1980); Tenney Telephone Co. v. United States, 82 F.2d 788 (7th Cir. 1936). The point we make is that the failure to record the purported Northland-NVST land contract, in which according to petitioners NVST committed itself to pay $ 3,000,000 for valuable property, enabled Ace and Martin to, and they did, continue dealing with the property as their own and is further evidence of the artificiality of the entire transaction.
21. The record does not show that the mortgage proceeds were paid to NVST, and we do not believe they were because the mortgage was personally guaranteed by Cunningham and his wife, who had no interest in NVST.↩
22. Again, it should be borne in mind that Ace is an experienced Wisconsin lawyer. He must have understood the effect of signing a bona fide land contract as explained in the Wisconsin cases as early as Williamson v. Neeves, 94 Wis. 656, 69 N.W. 806, 809 (1897), as follows: After the execution of the contract, the vendee must be regarded as the real owner of the property, though not the holder of the legal title,--the vendor holding the legal title in trust for the vendee, subject to the payment of the purchase money; and, as between the parties, the latter is regarded as a mortgagor, and the vendor as the mortgagee, of the premises for the amount due for the purchase money. Mueller v. Novelty Dye Works, 273 Wis. 501, 78 N.W.2d 881 (1956); Ritchie v. City of Green Bay, 215 Wis. 433, 254 N.W. 113, 114↩ (1934).
23. Patrick Schulte, a property appraiser with the Wisconsin Department of Revenue, testified: I asked Mr. Bernstein [Ace] who owned it [the Juneau plant] and he stated that Northland Developers, Incorporated owned the land, the buildings the equipment. At another point, Schulte testified: I was familiar enough with old facilities such as this one to feel that it [the $ 3,000,000 price] was completely unrelated to value. When I became aware of this price, I felt that it was a transaction that had taken place, for whatever reason, and that it had nothing to do with the value of the property.↩
24. Petitioners have not contested respondent's disallowance of the rent for the EMMNS equipment. Thus, we sustain respondent's determination on this issue.↩
25. Petitioners do not contest the percentage used by respondent's witness. Rather, they would apply that percentage to a figure based upon a $ 3,000,000 fair market value in 1969 to support their conclusion that the rent paid by Milbrew was reasonable. We previously have found, however, that the fair market value of the plant was approximately $ 500,000 in 1969. ↩
26. Because of our holding, we do not reach respondent's alternative argument based on sec. 267.
27. Petitioners have conceded that an additional equipment purchase of $ 12,640 in 1972 is not eligible for the investment credit.↩
28. Sec. 1.46-4(d)(1), Income Tax Regs., provides in pertinent part: (d) Noncorporate lessors.(1) In the case of a lease entered into after September 22, 1971, a credit is allowed under section 38 to a noncorporate lessor of property with respect to the leased property only if-- (i) Such property has been manufactured or produced by the lessor in the ordinary course of his business, or (ii) The term of the lease (taking into account any options to review) is less than 50 percent of the estimated useful life of the property (determined under sec. 1.46-3(e)), and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162↩ (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. * * * 29. We note that our holding that Northland as agent for Ace and Martin, and not NVST, was the true owner of the plant is not inconsistent with NVST purchasing and leasing equipment to Milbrew.↩
30. Sec. 1.46-4(d)(3)(i), Income Tax Regs., provides in pertinent part as follows: (3)(i) The more-than-15 percent test described in subparagraph (1)(ii) of this paragraph is based on the relationship of the expenses of the lessor relating to or attributable to the property to the gross income from rents of the taxpayer produced by the property. The test is applied with respect to such expenses and gross income as are properly attributable to the period consisting of the first 12 months after the date on which the property is transferred to the lessee. When more than one property is subject to a single lease and, pursuant to subparagraph (4) of this paragraph, the arrangement is considered to be a separate lease of each property, the test is applied separately to each such lease by making an apportionment of the payments received and expenses incurred with respect to each such property, considering all relevant factors. Such apportionment is made in accordance with any reasonable method selected and consistently applied by the taxpayer. * * * 31. Petitioners err in apportioning the rent income. We have held that NVST was not the true owner of the plant. Therefore, to the extent that NVST actually received payments constituting rent, the entire amount of that rent would be for the equipment. Even assuming, arguendo, that NVST did own the plant, petitioners' computations are still erroneous. Petitioners used $ 4,004,935 as the total basis in the plant. Because we have held that the plant's fair market value was substantially less than the $ 3,000,000 figure claimed by petitioners, the ration of the value of the equipment to the value of the plant would be much larger than that calculated by petitioners. Consequently, a larger share of rent income would be attributed to the equipment than that calculated by petitioners.
32. Because of our holding, we do not reach respondent's contention that petitioners have failed to prove that the term of the lease on the equipment was less than one-half the estimated useful life of the equipment.↩
33. SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OF INVESTMENT. (a) Nonrecognition of Gain or Loss from Exchanges Solely in Kind.--No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.↩
34. Because of our holding, we do not reach the issue of whether the transferors of the Center Street property were the same parties as the recipients of the N. Maryland property. We note, however, that although Martin testified that he and Ace deeded the Center Street property to their wives in 1959, the closing papers on the sale of the property to the purchasers, Ferdinand and Lillian Schmutzler, show Ace, Martin, and the trustees of the Brown estate as the sellers.
35. Martin's testimony concerning market value is vague and unconvincing.↩
36. ND Co. is a noncorporate entity owned equally by Ace and Cunningham. It should not be confused with Northland which is a corporation owned equally by Ace and Martin. ↩
37. Ace testified that the total amount of loans to ND Co. from NVST prior to May 26, 1970, was $ 237,500. Petitioners, however, have not introduced any evidence indicating the nature and source of the alleged loan in an amount greater than the $ 206,689.03 payments by Milbrew.
38. Indeed, the only place where the $ 225,000 entry appears is on the NVST partners' capital account. This account merely reflects depreciable basis and is not an indication of how or whether that payment was made.↩
39. As we have pointed out, despite this $ 220,000 bookkeeping entry, NVST reported no taxable income in 1969.↩
40. At the time Milbrew made the payments on ND Co.'s loans, NVST did not own any equipment used in the plant. Thus, those payments also cannot be considered rent for equipment, and petitioners do not argue otherwise.
41. We note that NVST's returns for the years in issue indicate that depreciation was taken on the full amount of the 1970 purchase price less the cost attributed to land. Nevertheless, by 1973, NVST and others were taking additional, separate depreciation on at least two of the properties included in the 1970 purchase. For example, in 1972, NVST, Ace, Martin, Cunningham, and another individual purchased an apartment complex located at 2645 N. Farwell in a condemnation sale for $ 632,865. That property was one of the properties in which NVST purchased an interest in May 1970. Although the purchasers in the 1972, sale, including NVST, began taking depreciation based on the 1972 purchase price, NVST's basis in the properties purchased in 1970 was not decreased to reflect the sale of 2645 N. Farwell. Additionally, in 1973, Martin and Ruth Bernstein, Ace and Eva Bernstein, Cunningham, and NVST completed the construction of an apartment building at 2727 N. Maryland and began taking depreciation upon that property. This property, however, was also included in the properties purchased by NVST in 1970 and thus constituted a portion of the basis of those properties upon which NVST claimed depreciation deductions. In 1973, NVST continued to claim depreciation deductions upon the entire stated 1970 basis as well as upon its share of the costs of the construction completed in 1973.
42. Petitioners have failed to address the issue of whether the useful life of the roof should be reduced from the 20 years claimed on their return to the 15 years claimed in their amended petition. We conclude, therefore, that they have abandoned that contention. In any case, we find that they have failed to prove that the proper useful life was 15 rather than 20 years.
43. Respondent asserted this issue in his third amended pleading. Respondent, therefore, has the burden of proof. Rule 142, Tax Court Rules of Practice and Procedure.↩
44. Because of our holding, we do not reach respondent's alternate contention that the amount constitutes a guaranteed payment.↩
45. Although the actual titleholder of the Juneau plant was Northland, respondent has deemed Ace and Martin as the beneficial owners entitled to the depreciation deductions.↩